# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

CHRIS HAULMARK,                                )
       Plaintiff,                              )
       V.                                     )
STATE OF KANSAS,                               )
THE KANSAS SENATE,                             )
SUSAN WAGLE, in her official capacity          )
as President of the Kansas Senate,             )   Civil Action No. _20-cv-4033-SAC-TJJ_
KANSAS HOUSE OF                                )
REPRESENTATIVES,                               )
       and                                    )
RON RYCKMAN, in his official capacity          )
as Speaker of the Kansas House of              )
Representatives,                               )
       Defendants.                            )
_____                )

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Chris Haulmark, appearing *pro se*, brings this action against the Defendants--State of Kansas, The Kansas Senate, Susan Wagle in her official capacity as President of the Kansas Senate, Kansas House of Representatives, and Ron Ryckman in his official capacity as Speaker of the Kansas House of Representatives-- alleging to violate his protected constitutional rights to participate in and enjoy the benefits of the services, programs, and activities of the Kansas Legislature. He alleges as follows:

## I.     INTRODUCTION

1.     This is an action for damages, including compensatory damages, equitable relief, including injunctive and declaratory relief, and expenses of court, to redress

violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131-12134 *et seq.* (hereinafter "ADA") and violations of Section 504 of the Rehabilitation Act of 1973 (hereinafter "Section 504"), as amended, 29 U.S.C. § 794 *et seq.*

2.    Unless otherwise said, when the term "Kansas Legislature" is used, all of the Defendant parties are being collectively referred to in this filed complaint.

3.    The exercise of free speech is fundamental to a thriving democracy. The First Amendment, as applied to the states by the Fourteenth Amendment, protects the exercise of free speech during public forums and of adequately petitioning the government for redress of grievances, only possible if getting the information about legislative actions of the representatives necessary to hold the elected members accountable for legislative acts. As the U.S. Supreme Court has stated, "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

4.    Historically since the early 1980s until some time shortly after 1997, the Deaf individuals participated with their protected constitutional rights in the activities of the Kansas Legislature when the Kansas Legislature provided effective communication, auxiliary aids, and equal participation with their programs, services, and activities.

5.    The activities of the legislative proceedings by the Kansas Legislature are conducted in the chambers of the Senate and House and the public spaces of the committees and subcommittees. These spaces are open, free of any charge, to the public. Anyone is able to physically attend, observe, and participate in the activities of those legislative proceedings. Anyone is able to physically visit the offices of the elected legislators to participate in the activities by engaging, interacting, and communicating with the elected

legislators and staff members in a wide array of protected First Amendment activity. According to the ADA webpage of the website, administered by the Kansas Legislature, any individual with a disability may request accommodations for any committee or legislative session with a two working days notice in advance of the event.

6.     The Kansas Legislature controls, maintains, and administers a website made available to the general public, free of charge, as content in the form of live audio streams produced by the in-house broadcasting equipment, consisting of the activities including the legislative proceedings. Included within the website as online content are at least hundreds of archived audio files, which communicate only audible information.

7.     The Kansas Legislature controls, maintains, administers, and presents on a Youtube channel, a third party platform, made available to the general public, free of charge, as content in the form of live audiovisual streams produced by the in-house broadcasting equipment, consisting of the legislative proceedings in the chambers of the Kansas State Capitol. Included within the online content are hundreds of archived audiovisual files, which communicate only aurally and show visual activities in the legislature chambers within the Kansas State Capitol.

8.     Elected legislators as members of the Kansas Legislature maintain social media accounts, which, in many cases, are important spaces for two-way communication with elected members and between interested members of the public about governmental actions and social policies. These social media spaces have become the modern-day public square, an open marketplace of ideas and free expression. Of course, elected members are entitled to express themselves in these public forums; just as certainly, the public has the same protected rights of free speech. Governmental action to restrict speech based on how the content is available as published and how two-way communication is established with

the public "is presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2226 (2015). There are audiovisual content being produced, published, and distributed by the elected members of the Kansas Legislature with the intention to be available on third party platforms such as Youtube, Facebook, Twitter, and other social media spaces, free of charge, as channels for communicating and interacting with the public about the operations of their elected offices. Some elected members of the Kansas Legislature continue to use their social platform accounts and digitally-delivered newsletter via email, on occasion, to communicate about other issues not directly related to official government business. These social platform accounts are generally available to the public at large without regard to political affiliation or any other limiting criteria.

9.      Plaintiff Chris Haulmark (hereinafter "Mr. Haulmark") is among the estimated 50,000,000 Americans who suffer with hearing loss to a degree that it substantially impacts their ability to understand and comprehend the audible word. The ability of individuals with hearing disabilities to access information about the legislative actions of the representatives of the Kansas Legislature during the legislative proceedings in real time, to interact in two-way communication as public in the modern-day public spaces with the elected members, and to engage with the offices of the legislators and the staff of the Kansas Legislature just like other individuals without a hearing disability do is a protected constitutional right. In order for Mr. Haulmark to exercise his constitutional protected rights, Mr. Haulmark requires from the Kansas Legislature the effective communication, auxiliary aids, and equal participation in the form of, but not limited to, real-time captions, transcripts, and sign language interpreters for Mr. Haulmark to

participate in and enjoy the benefits of the services, programs, and activities of the Kansas Legislature.

10.     In February 2019, Mr. Haulmark repeatedly requested thereafter the necessary accommodations from the Kansas Legislature to participate in protected First Amendment activities in order to pursue with his Fourteenth Amendment protected rights. Defendants are on notice for at least a year of Mr. Haulmark's repeated requests for the necessary accommodations yet, repeatedly blatant disregard and refuse to furnish the necessary effective communication, auxiliary aids, and equal participation.

11.     With the intentional denial of his protected constitutional rights by the Defendants, Mr. Haulmark is being deprived of his rights without the due process of law and being subject to cruel and unusual treatment inflicted by the Kansas Legislature. The Kansas Legislature placed Mr. Haulmark into political and societal isolation for Mr. Haulmark to experience noneconomic losses such as irreparable damage to reputation, inconvenience, loss of enjoyment of life, mental anguish and distress, pain and suffering, humiliation, and anxiety.

## II.   JURISDICTION AND VENUE

12.     This Court has jurisdiction of this action under Title II of the ADA, 42 U.S.C. § 12131-12132, and 28 U.S.C. § 1331 and 1345. This Court may grant the reliefs sought in this action pursuant to 28 U.S.C. § 2201 and 2202.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial portion of the acts and omissions giving rise to this action occurred in the District of Kansas. 28 U.S.C. § 1391(b).

## III.   PARTIES

14.     Plaintiff Chris Haulmark is a citizen of the United States of America. At all times relevant, Mr. Haulmark is a resident of Olathe, Johnson County, Kansas. Mr. Haulmark is currently an active political community leader since 2017. Mr. Haulmark is a qualified individual with a hearing disability. Mr. Haulmark has been deaf since he was one year old. Mr. Haulmark is substantially limited in the major life activities of hearing and speaking aurally. An audio headset does not provide Mr. Haulmark effective communication access. Mr. Haulmark's preferred method of communication is through American Sign Language (ASL). Mr. Haulmark also uses auxiliary aids such as video conferencing and electronic devices to communicate. Mr. Haulmark watches videos with the assistance of captioning function.

15.     Defendant State of Kansas is a public entity as defined in 42 U.S.C. § 12131(1)(A) and is a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794.

16.     Defendant Kansas Senate is one of the two branches of the Kansas Legislature created by Article 2 of the Kansas Constitution. The Kansas Senate comprises 40 state senators as elected members of the Kansas Legislature.

17.     Defendant Susan Wagel is the President of the Kansas Senate. She is sued in her official capacity.

18.     Defendant Kansas House of Representatives is one of the two branches of the Kansas Legislature created by Article 2 of the Kansas Constitution. The Kansas House of Representatives comprises 125 state representatives as elected members of the Kansas Legislature.

19.     Ron Ryckman is the Speaker of the Kansas House of Representatives. He is sued in his official capacity.

## IV.   STATEMENT OF FACTS

*In the matters of services, programs, and activities on grounds of the Kansas State Capitol building*

20.    The Kansas Legislature provided funds for the Kansas Commission for the Deaf and Hard of Hearing (hereinafter "KCDHH") to retain the sign language interpreters as part of the KCDHH's staff between 1982 and some time after 1997. It was a common practice for a sign language interpreter to be available with about 10 minutes to 20 minutes of waiting time after a Deaf or Hard of Hearing individual submitted a request with the Kansas Legislature when visiting the Kansas State Capitol building. During and after 1997, the interpreters of the KCDHH were gradually disbanded due to lack of funding at the decision of the Kansas Legislature.

21.    During the 2015-2016 Legislative Session with the passage of the bill to become the law of K.S.A. § 75-5397e, deaf constituents requested for sign language interpreters to be able to participate in the individual meetings with the members of the Kansas Legislature. The Legislative Administrative Service (hereinafter "LAS") of the Kansas Legislature shared information about the estimated expenses of the required sign language interpreters with the elected members of the Kansas Legislature during this time period. Based on the shared information from LAS, some members of the Kansas Legislature canceled scheduled meetings with the deaf constituents. As a result, the deaf constituents were unable to participate, fully and free of any discrimination, with their protected constitutional rights during the passage of the K.S.A. § 75-5397e law.

22.    For at least two years as it is shown on the ADA page of the website administered by the Kansas Legislature: "*Any individual with a disablility may request accommodations for any committee or legislative session.*" Furthermore on this webpage:

"*Requests should be made at least two (2) working days in advance of the meeting by contacting Legislative Adminstrative Services…*" On the same ADA webpage, it is shown that two audio headsets are readily available for committee rooms within the Kansas State Capitol building.

23.     Frequently, the elected members, the staff members, and the other employees of the Kansas Legislature hold spontaneous planned events after announcing within the "*two (2) working days*" time span. It is difficult for an individual with hearing disabilities to obtain necessary accommodations such as sign language interpreters for those spontaneous planned events as the activities on the grounds of the Kansas State Capitol.

24.     Hypothetically and in pursuant to Kansas Open Meeting Act, K.S.A. § 75-4317 *et seq.*, a member of the Kansas Legislature decides with a short notice during Monday to hold a legislative event on Tuesday as the next day. Mr. Haulmark is not able to obtain a sign language interpreter as a necessary accommodation from the Kansas Legislature to participate in this legislative activity on Tuesday. The policy of the "*two (2) working days*" notice requires Mr. Haulmark and other individuals with hearing disabilities to submit the request on Thursday or earlier during the week before this event.

25.     Hypothetically, Mr. Haulmark successfully obtains a sign language interpreter after providing the required two-days notice to participate in the activity of a legislative session. During this legislative session, when the members of the legislative session decide to postpone the pending legislation issue onto the next day, Mr. Haulmark and other individuals with hearing disabilities are unable to obtain a sign language interpreter to continue to participate in this legislative activity when resumed.

26.     The Topeka Capital-Journal published an article, "*Kansas Legislature set to begin streaming live audio of committee hearings*" on Jan. 3, 2017. This article shares: "*The*

*Kansas Legislature will soon begin streaming live audio of committee hearings over the internet.*" Furthermore: "*Residents have been able to listen to Kansas Senate or House sessions in real time on the internet for several years.*"

27.     The live audio streams of the committee hearings are available on the website administered by the Kansas Legislature. The Kansas Legislature uses the software platform of Sliq Media Technologies to digitally record, stream, and publish audio content.

28.      Several state legislatures such as the Virginia House of Delegates and the Arkansas House of Representatives use the software platform of Sliq Media Technologies to record, stream, and publish their legislative proceedings while providing effective communication with the displaying of accurate real-time captions.

29.     The Kansas Legislature does not provide any captions on its software platform of Sliq Media Technologies when it is readily achievable to do so. This shows how the Kansas Legislature fails to develop and implement their in-house broadcasting equipment to be readily accessible and usable by Mr. Haulmark and other individuals with hearing disabilities.

30.     The Kansas Senate and House sessions are available on a Youtube channel as live audiovisual streams. Some of the recorded audiovisual content use automatic machine-generated captions, created at least a day after being streamed or published. The automatic machine-generated captions do not provide effective communication for Mr. Haulmark and other individuals with hearing disabilities due to lack of the following: errorless accuracy, uniformity in style and presentation for crucial understanding, complete textual representation of the audio as close to verbatim as possible, and including speaker identification and non-speech audio information with clarity. Some other audiovisual content on the same Youtube channel does not include captions or transcripts.

31.    As of March 12, 2020, Governor Laura Kelly of Kansas proclaimed a State of Disaster Emergency within Kansas relating to COVID-19. After this proclamation, many committees and subcommittees of the Kansas Legislature use the software platform of Zoom platform to record, to stream, and publish their recorded legislative proceedings on the Youtube channel, administered by the Kansas Legislature. The audiovisual content are accommodated with automatic machine-generated captions that do not provide effective communication for Mr. Haulmark and other individuals with hearing disabilities.

32.    Mr. Haulmark has lived in Kansas since November, 2014. Mr. Haulmark is bilingual with American Sign Language (ASL) as his natural and primary language with written English as his second language. Mr. Haulmark does not audibly hear nor verbally speak in the English language.

33.    Mr. Haulmark has been involved with the civic system in America for at least two decades by participating in some of the most important privileges and duties this country asks of its citizens. Privileges and duties being a registered voter and improving local communities by participating in numerous political and legislative activities.

34.    The City of Olathe City Council, the Board of Education for Olathe Public Schools, the Johnson County Board of County Commissioners, and other local governmental entities provide sign language interpreting teams when Mr. Haulmark physically attends their legislative and policy-making meetings. They produce and publish online streaming audiovisual content of their proceedings with closed captions to provide Mr. Haulmark the necessary effective communications. Some of these entities' audiovisual content include a sign language interpreting team in the frame of the videos.

35.    Mr. Haulmark has been a congressional candidate and then a state representative candidate from June 2017 until November 2018.

36.     During the legislative session of 2017 and 2018 and on the campaign trail, Mr. Haulmark attempted to demonstrate his ability of political leadership by sharing the information of the legislation bills, created during the legislative activities that would fundamentally transform the lives of thousands of Kansans, with the community leaders and constituents.

37.     Mr. Haulmark has been limited in his political functions as a community leader in the state of Kansas and the local neighborhood of Olathe because he is intentionally excluded by the Kansas Legislature. With the openly discriminatory nature of the Kansas Legislature excluding Mr. Haulmark from the legislative activities, these relationships between Mr. Haulmark and the community leaders and the constituents deteriorated significantly. As a result, Mr. Haulmark suffered blatant and irreparable damage to his reputation.

38.     On January 14, 2019, the House session began its new legislative session. Mr. Haulmark was not able to participate in the legislative proceeding as an observer in the chamber of the Kansas House of Representatives because there was not a sign language interpreter being available.

39.     Mr. Haulmark reached out to few of the elected members of the Kansas Legislature on how to obtain communication access to the Kansas House of Representatives on the same day. He was told by an elected member that the LAS would not provide a sign language interpreter for the day.

40.     During the next hour, Mr. Haulmark visited the office of LAS to request for a sign language interpreter or any other available auditory aids for access to the legislature proceeding in the chamber of the Kansas House.

41.     Mr. Haulmark was told by a staff member of LAS that a two business days notice is required for auditory aids. Mr. Haulmark also was told that there were not any other auditory aids being available on that day.

42.     Mr. Haulmark attempted to use his smartphone to watch the live video being streamed from the Kansas House chamber, published on the Youtube channel. There were not any captions or any other accommodations being provided with this streaming live video on that day.

43.     Mr. Haulmark sent a letter, dated February 18, 2019, addressed to Defendant Ron Ryckman and carbon copied to Defendant Susan Wagle and other officers. This letter included a request for the online streaming services, provided by Kansas Legislature, available to the public free of charge to be readily accessible and being in compliance with some Kansas statutes and the Section 504 of the Rehabilitation Act.

44.     Mr. Haulmark did not receive a response to the February, 2019 letter.

45.     On February 20, 2019, an email, with the subject of "*HB 2219 & Existing IT Accessibility Policy*", was circulated by Courtney A. Fitzgerald, the Communications Director & Legislative Liaison in the Office of Information Technology Services, throughout the Kansas government with a clarification from Cole Robison, Director of IT Accessibility in the same office, on the 2019 House Bill 2219 with the importance on how the Information Technology Executive Council (ITEC) Policy 1210 "*requires all State of Kansas government entity content, made available through information technology, to be accessible to and usable by individuals with disabilities, and outlines specific technical criteria (adopted from federal law and industry standards) by which such accessibility is to be achieved.*"

46.     The Kansas City Star published an article, "*Kansas transparency advocates push video streaming for statehouse committee hearings*" on Feb. 20, 2019. This article

shares, "*Currently, the House and Senate sessions are the only meetings broadcasted via YouTube. Over the past two years, the legislature has equipped the 13 committee rooms to stream audio.*" This article adds, "*Thomas Day, director of Legislative Administrative Services (LAS), the entity that would be responsible for outfitting committee rooms for broadcast, said one of his main concerns is the cost of closed captioning, which runs around $3 per minute.*"

47.   Mr. Haulmark filed a petition for Writ of Mandamus, on June 4, 2019 with the Kansas Supreme Court, requesting the compelling of the Kansas Legislature and LAS to be in compliance with several laws for the online streaming services to be readily accessible with effective communication provided for Mr. Haulmark and other individuals with hearing disabilities. (Kansas Supreme Court, Appellate Case No. 19-121312-S). Mr. Haulmark received a letter, dated September 27, 2019, from Kansas Supreme Court with the dismissal and the reason, "*The court has considered and dismisses the petition for writ of mandamus for failure to state a cause of action over which this court has original subject matter jurisdiction. This dismissal is not a decision on the merits of any allegations raised in the petition...*"

48.   On the day of November 1, 2019, Mr. Haulmark submitted a Kansas Open Records Act, K.S.A. § 45-215 *et seq.*, (hereinafter "KORA") request addressed to Tom Day as Executive Director of the Legislative Administrative Services, and carbon copied to Defendant Ron Ryckman, Defendant Susan Wagle, Anthony Fadale as State ADA Coordinator, and Robert Cooper as Executive Director of KCDHH with requests for those public records of the audio streamings and Youtube videos to be fully accessible for Mr. Haulmark under the Title II of the Americans with Disability Act and the Section 504 of the

Rehabilitation Act. Included in this request is a list of hundreds audio-only recordings on the committee proceedings that occurred during the 2019 Legislative Session.

49.     On the day of November 15, 2019, Tom Day submitted a response to the KORA request by Mr. Haulmark with the cost being in the estimated amount of $153,194 to produce the transcripts of the listed audio recordings. In this same response, Tom Day cited in pursuant to the KORA, K.S.A. § 45-218(e), to deny Mr. Haulmark's request for the production of the transcripts for the audio-only recordings because "*[t]his is a significant cost.*" Tom Day offered to create transcripts for limited numbers of specific committee meetings with Mr. Haulmark's choosing while not applying the same restriction to any other individuals without a hearing disability to access the audio recordings of the legislative proceedings. In this same response, Tom Day invited Mr. Haulmark for a meeting with the Kansas Legislature.

50.     The annual budgets since 2016 of the Kansas Legislature has been more than $15,000,000 per year.

51.     The Governor's Budget Report for Fiscal Year 2019, "*Also included in this budget are the costs to run the Kansas Legislative Information Services System (KLISS), which includes the website for the Legislature and the streaming of legislative meetings on the web. For FY 2019, the Governor recommends expenditures totaling $19.5 million, all from the State General Fund*" for the Kansas Legislature.

52.     The Governor's Budget Report for Fiscal Year 2020, "*Also included in this budget are the costs to run the Kansas Legislative Information Services System, which includes the website for the Legislature and the streaming of legislative meetings on the web. For FY 2019, the Governor recommends expenditures totaling $20,866,530, all from the State General Fund. For FY 2020, expenditures totaling $20,347,809 are recommended, all*

*from the State General Fund"* and *"will fund 40.00 FTE positions each year"* for the Kansas Legislature.

53.     The Governor's Budget Report for Fiscal Year 2021, *"Also included in this budget are the costs to run the Kansas Legislative Information Services System, which includes the website for the Legislature and the streaming of legislative meetings on the web. For FY 2020 and FY 2021, the Governor recommends expenditures totaling $23,861,524 and $20,846,842, all from the State General Fund"* and *"will fund 40.00 FTE positions each year"* for the Kansas Legislature.

54.     On December 5, 2019, there was a meeting held in the Kansas State Capitol building hosted by Tom Day with Gordon Self, Revisor of Statutes, MJ Willoughby, Assistant Attorney General, Anthony Fadale, ADA Coordinator for the State of Kansas, Robert Cooper, Executive Director of KCDHH, Chriz Dally, Chair of KCDHH, and Kim Anderson, President of Kansas Association of the Deaf. A sign language interpreter was provided as coordinated with KCDHH for this meeting.

55.     During this December 5 meeting, Tom Day stated that the Kansas Legislature has been working on providing accessibility to the legislative proceedings for at least two years prior to the day of this meeting. Tom Day shared that he understood that as long as the audio streaming content and audiovisual content are continued to be produced and published without the accommodations, this act is being in noncompliance with ADA and Section 504 to discriminate against Mr. Haulmark and other individuals with hearing disabilities. Tom Day shared that the Kansas Legislature understood the requests of the accommodations to ensure that the broadcasting equipment is providing content to be readily accessible to individuals with hearing disabilities. Tom Day stated that the budget is a higher priority over the accessibility of the individuals with hearing disabilities. Tom

Day shared that the office of LAS has at least a $7 million dollars budget with 16 members of his staff working on the broadcasting system to stream the video and audio of the legislative proceedings. Tom Day stated that he will contact KCDHH to work with the current vendor(s) to provide accessibility with the current streaming and broadcasting equipment. Tom Day assured Mr. Haulmark that he will provide a report on the progress to provide access to the Kansas Legislature. Tom Day shared during this meeting that he will provide "something before the beginning" of the 2020 Legislative Session.

56.    Tom Day and Anthony Fadale, ADA Coordinator for the State of Kansas, appeared at the commission meeting of KCDHH on January 10, 2020 to share how Tom Day has a responsibility to implement plans and directives of the Legislative Coordinating Council of the Kansas Legislature. Tom Day added that "*The Legislative Coordinating Council is fully behind us in developing a plan to make the legislature inclusive for the Deaf and Hard of Hearing community.*"

57.    The Kansas Legislature had their first day of session held on January 13, 2020. Those committee proceedings, streamed as audio-only, continued to be completely inaccessible to Mr. Haulmark. The videos of the Kansas Senate and Kansas House of Representatives proceedings do not provide effective communication with the automatic-generated captions being inaccurate and without identification of the speakers on the videos.

58.    On January 14, 2020, Mr. Haulmark emailed Tom Day to share that the Day One of the 2020 Legislative Session had videos that are inaccessible to him. In the email, Mr. Haulmark submitted a request: "*Because of the inaccessible information with the current videos, I am including a request in this email for me to obtain a complete and*

*accurate transcriptions for those published videos and the future videos, planned to be published on this Youtube channel.*"

59.    Tom Day issued a response via email on January 16, 2020 to deny Mr. Haulmark the production of the transcripts with the citation to KORA for the exemption. In the same response, Tom Day applied an impediment, not faced by individuals without a hearing disability, based on Mr. Haulmark's disability: "*While KORA does not require production of these transcripts, and as we have previously stated, we are willing to consider requests for specific proceedings of interest to you, such as portions of proceedings regarding specific bills. Please feel free to let me know if there are specific bills of interest to you such as were referred to generally in your correspondence.*"

60.    Mr. Haulmark sent an email to Tom Day on March 2, 2020 to request "*transcripts to be produced and published with all of the content produced since the beginning of the 2020 legislature session. This includes the audio streams covering the legislative proceedings during the committee and subcommittee meetings.*"

61.    Mr. Haulmark attended the Deaf and Hard of Hearing Day at the Capitol event held in the Kansas State Capitol building on March 11, 2020. KCDHH provided sign language interpreters for this event. With a sign language interpreter accompanying Mr. Haulmark, Mr. Haulmark met with Defendant Ron Ryckman and requested for accommodations to be available with the online audio-only streaming content, produced and published by Kansas Legislature, for Mr. Haulmark to participate in the activities of the Kansas Legislature. Defendant Ron Ryckman responded that the Kansas Legislature would not deal with this matter until the 2019-2020 Session of the Kansas Legislature is over.

62.    Legislative Coordinating Council posted a notice stating that the Legislative Coordinating Council will meet on April 8, 2020 as called to review an executive order

issued by the Kansas Governor. In this same notice, it is stated: "*If you do not have internet access, contact Tom Day at Tom.Day@las.ks.gov for an alternative medium for interactive communication to access the meeting as such communication allows.*" Furthermore, "*Any individual with a disability may request accommodation in order to participate in Legislative Coordinating Council meetings. Requests for accommodation should be made by contacting Legislative Administrative Services at 785-296-2391 (TTY: 711) or at LegServ@las.ks.gov and will be granted as available.*"

63.     After following up twice, one on March 23, 2020 and the next one on April 8, 2020 as per to the instructions in the notice of the Legislative Coordinating Council, Mr. Haulmark sent a request: "*I am requesting for the transcription of the Legislative Coordinating Council meeting that was held during today.*"

64.     Tom Day provided a response on April 10, 2020 to deny Mr. Haulmark, based on his disability: "*Previously, I had responded to your KORA request, including in a letter dated November 15, 2019. In that letter, I responded to your request for transcripts of proceedings for legislative chamber sessions and committee meetings by stating no transcripts exist and therefore, need not be produced pursuant to KORA. To the extent that you are requesting these transcriptions again pursuant to KORA, the transcriptions need not be provided under KORA for the reasons stated in my previous letter to you of November 15, 2019, incorporated by reference as though fully restated herein.*" Furthermore, "*In terms of your request for the April 8, 2020 meeting of the Legislative Coordinating Council, no transcript currently exists and therefore, under KORA, need not be produced under KORA. However, I am looking into that request further. If the transcript becomes available, I will provide it to you.*"

65. To the date of the filing of this complaint, the Kansas Legislature is completely denying Mr. Haulmark, based on his hearing disabilities, access to the audio streams, on the website administered by Kansas Legislature, by refusing to furnish captions, transcripts, or any other auditory aids for the audio streams. The audiovisual content on the Youtube channel, administered by Kansas Legislature, do not provide effective communication access, afforded to other individuals without a hearing disability, for Mr. Haulmark.

66. The intentional discrimination by the Defendants prevents Mr. Haulmark from participating in meetings with other local community leaders. For many months, Mr. Haulmark has been suffering irreparable harm with experiences of tremendous mental and emotional sufferings including pains of rejection, isolation, indignity, humiliation, stigmatization, and emotional distress of being prohibited, on the basis of his disability. Mr. Haulmark is experiencing social isolation when his political colleagues do not want to explain to Mr. Haulmark what he has missed out from the legislative proceedings.

***In the matters of the Kansas Legislature on the social media platforms***

67. The Internet is more than just a collection of websites; it is an overarching architecture facilitating a wide variety of content, applications, protocols, and devices. Access to the Internet is a primary driver of education, employment, cultural engagement, civic participation, and more. The Internet is essential for education, employment, information, and cultural and democratic participation. Yet the Internet—the gateway to the economic, social, cultural, and participatory fruits of the information age—has communication barriers to the significant population of individuals with hearing disabilities.

68.     Many elected members of the Kansas Legislature are using government staff, on government time, and other public resources to manage and administer the social media platforms as various forms of digital forums to communicate with the public, including digitally-delivered newsletters, Youtube, Facebook, Twitter, and other social media spaces.

69.     These social media platforms, administered by members of the Kansas Legislature, are modern public forums, as the most active, consistent, and interactive form of communication, which hosts a lively exchange regarding governmental events, official announcements, legislative policies, and other activities. Those members of the Kansas Legislature call their live video streams on the social media platform as "Virtual Town Halls" with the intention for the public to interact with each other and with the Kansas Legislature online and in a direct manner. These online public forums are becoming increasingly common and the U.S. Supreme Court has recognized them as important places for the "exchange of views[.]" *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

70.     Some members of the Kansas Legislature produce and publish audiovisual content, free of charge to the public on those social media platforms, that are inaccessible to and excludes Mr. Haulmark on the basis of his disability. These videos as audiovisual content are inaccessible due to lack of real-time captions and lack of sign language interpreters being visible on the video screen.

71.     Some members of the Kansas Legislature hosting "Virtual Town Halls" exclude Mr. Haulmark solely on the basis of his disability from participating in the activities of the Kansas Legislature as the ongoing real-time exchanging views on those social media platforms.

72.     Since May 2017, Mr. Haulmark has repeatedly requested via Email, Facebook, Twitter, and other social media platforms for the members of the Kansas Legislature to

provide communication accessibility for the videos being produced and published by them. Some of the members of the Kansas Legislature are defensive and dismissive of Mr. Haulmark's requests for him to participate in the activities of the Kansas Legislature conducted on those social media platforms.

73.     Many videos continue to remain publicly available on the social media platforms, administered by the members of the Kansas Legislature, without effective communication access for Mr. Haulmark and other individuals with hearing disabilities.

## V.     CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## Americans With Disabilities Act -- Title II

## (42 U.S.C. § 12131-12134 *et seq.*)

74.     Plaintiff Chris Haulmark incorporates the allegations in the preceding paragraphs, as if alleged herein.

75.     Title II of the ADA, 42 U.S.C. § 12131-12134, *et seq.*, and 28 C.F.R. § 35 guarantees equal access for qualified individuals to the benefits of the services, programs and activities of a public entity.

76.     Title II of the ADA mandates, *inter alia*, that "*no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.*" 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

77.     In addition, a public entity may not, on the basis of disability, "*[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service[.]*" 28 C.F.R. § 35.130(b)(1)(i).

78.     In addition, a public entity may not, on the basis of disability, "*[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others[.]*" 28 C.F.R. § 35.130(b)(1)(iii).

79.     In addition, a public entity may not, on the basis of disability, "*[a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program[.]*" 28 C.F.R § 35.130(b)(1)(v).

80.     A public entity is required to "*make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.*" 28 C.F.R § 35.130(b)(7)(i).

81.     In addition, "*A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others.*" 28 C.F.R § 35.160(a)(1).

82.     Such a public entity "*shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.*" 28 C.F.R § 35.160(b)(1).

83.     Title II of the ADA "*does not invalidate or limit the remedies, rights, and procedures of any other Federal laws, or State or local laws (including State common law)*

*that provide greater or equal protection for the rights of individuals with disabilities or individuals associated with them.*" 28 C.F.R. 35.103(b).

84.   It is unlawful for any public entity to "*coerce, intimidate, threaten, or interfere with*" an individual on the basis of his exercise of any right granted under Title II, including the protected rights to reasonable accommodations and effective communication. 28 C.F.R § 35.134(b).

85.   Defendants are a State government and a department, agency, or other instrumentality of a State or State government; accordingly, Defendants are public entities as defined in 42 U.S.C. § 12131(1).

86.   Plaintiff Chris Haulmark is a qualified individual with a disability as that term is defined in 42 U.S.C. § 12131(2). Mr. Haulmark is Deaf. Mr. Haulmark meets the eligibility requirements for participation in the programs, services, and activities of the Kansas Legislature which he sought.

87.   At all relevant times, the Defendants were aware of Mr. Haulmark's physical disability, namely that Mr. Haulmark is an individual with hearing disabilities. The Defendants had notice that an auxiliary aid was necessary for individuals with hearing disabilities, including Mr. Haulmark, to effectively communicate and participate in the services, programs, and activities of the Kansas Legislature.

88.   The Defendants including the members of the Kansas Legislature act as individuals and/or in their official capacities in all activities on the grounds of the Kansas State Capitol building, on their social media platforms, and in other public spaces. There can be no immunity here because the actions at issue of the members of the Kansas Legislature are not subject to the legislative-activities definition.

89.     The Defendants have failed and continue to fail to meet their obligations to provide Mr. Haulmark with opportunities that are equal to those provided to the individuals with a hearing disability. The Defendants have excluded Mr. Haulmark from participation in and denied Mr. Haulmark the benefits of their services, programs, or activities and have denied Mr. Haulmark the opportunity to participate as a constituent.

90.     The Defendants have failed to provide auxiliary aids and services to ensure equally effective communication with Mr. Haulmark and have failed to reasonably modify their policies, practices, and procedures as necessary to accommodate Mr. Haulmark.

91.     The Defendants are violating 42 U.S.C. § 12132 and its accompanying regulations by committing the following intentional discriminatory acts or practices on the basis of disability:

A.     failed to maintain policies and procedures to ensure compliance with ADA Title II, specifically policies that provide equal access and effective communication to individuals with hearing disabilities;

B.     failed to ensure that communications with Mr. Haulmark were as effective as communications with individuals without a hearing disability and to provide auxiliary aids and services necessary for effective communication;

C.     failed to provide reasonable modifications of policies, practices, and procedures to prevent discrimination;

D.     failed to provide opportunities and information in a manner that is timely, equally effective, and equally integrated; and

E.     otherwise discriminated and retaliated against Mr. Haulmark, including by excluding him from the participation of the legislative proceedings by refusing to furnish a sign language interpreter to be readily available and usable by

individuals with hearing disabilities to provide effective communication on the grounds of the Kansas State Capitol building for the spontaneous planned events as activities; refusing to provide real-time captions and transcripts for all of the audio content streamed on their website; and refusing to provide real-time captions, being equally accurate as for individuals without a hearing disability, for all of the audiovisual content being shared on social media platforms including Youtube, Twitter, Facebook, Email newsletters, and other social media platforms.

92.    In the absence of declaratory and injunctive relief, Mr. Haulmark has and will continue to suffer irreparable harm from Kansas Legislature's failure to comply with the law.

## SECOND CAUSE OF ACTION

## Section 504 of the Rehabilitation Act of 1973

## (29 U.S.C. § 794)

93.    Plaintiff Chris Haulmark incorporates the allegations in the preceding paragraphs, as if alleged herein.

94.    Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

95.    Section 504 defines "program or activity," in pertinent part, as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or

local government entity) to which the assistance is extended, in the case of assistance to a State or local government . . ." 29 U.S.C. § 794(b)(1).

96.     Such federally funded programs and activities must provide aids and services that "afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 34 C.F.R. § 104.4(b)(2).

97.     Furthermore, recipients of federal funds must provide individuals with disabilities aids, benefits, and services that are as effective as those provided to individuals without disabilities. 34 C.F.R. § 104.4(b)(1)(iii).

98.     Defendants receive federal grants, contracts, and other financial assistance, thereby subjecting themselves to the requirements of Section 504.

99.     Mr. Haulmark has a hearing disability. Mr. Haulmark is therefore a qualified individual with a disability under Section 504.

100.    Defendants excluded Mr. Haulmark, solely by reason of his disability, from participation in and denied him the benefits of or otherwise discriminated against and retaliated against him in their facilities, services, programs, or activities. Defendants' violation of Section 504 and its regulations has denied and continues to deny Mr. Haulmark an equal opportunity to participate in the activities and programs of the Kansas Legislature.

101.    Defendants' actions constitute intentional discrimination on the basis of a disability in violation of Section 504, in that Defendants have:

      A.     failed to maintain policies and procedures to ensure compliance with Section 504, specifically policies that provide equal access and effective communication to individuals with hearing disabilities;

B.     failed to ensure that communications with Mr. Haulmark were as effective as communication with individuals without a hearing disability and to provide auxiliary aids and services to ensure effective communication;

C.     failed to provide reasonable modifications of policies, practices, and procedures;

D.     failed to provide opportunities and information in a manner that is timely, equally effective, and equally integrated; and

E.     otherwise discriminated and retaliated against Mr. Haulmark, including by excluding him from the participation of the legislative proceedings by refusing to furnish a sign language interpreter to be readily available and usable by individuals with hearing disabilities to provide effective communication on the grounds of the Kansas State Capitol building for the spontaneous planned events as activities; refusing to provide real-time captions and transcripts for all of the audio content streamed on their website; and refusing to provide real-time captions, being equally accurate as for individuals without a hearing disability, for all of the audiovisual content being shared on social media platforms including Youtube, Twitter, Facebook, Email newsletters, and other social media platforms.

102.   In the absence of declaratory and injunctive relief, Mr. Haulmark has and will continue to suffer irreparable harm from Kansas Legislature's failure to comply with the law.

103.   By failing to meet their obligations to provide Mr. Haulmark with opportunities to participate that are equal to those provided to the members of the public without hearing disabilities, Defendants have and are excluding Mr. Haulmark from participating in and enjoying the benefits of the services, programs, or activities offered by

the Kansas Legislature. Mr. Haulmark is entitled to injunctive relief, as well as reasonable expenses of court. Mr. Haulmark is also entitled to compensatory damages in an amount to be determined at trial.

## VI.    CLAIMS FOR RELIEF

104.    WHEREFORE, Plaintiff Chris Haulmark demands judgement against the Defendants as follows:

A.    Enter a declaratory judgement, in accordance with 28 U.S.C. § 2201, declaring that the Defendants' actions and failures have violated and continue to violate Title II of the ADA and Section 504 by subjecting Mr. Haulmark to discrimination;

B.    A preliminary and thereafter permanent injunction relief, pursuant to 28 U.S.C. § 2202, requiring the Defendants to:

i.    to make reasonable modifications in policies, practices, or procedures, which such modifications are necessary to afford all offered services, facilities, privileges, advantages, or accommodations to Mr. Haulmark or other individuals with hearing disabilities;

ii.    to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against Mr. Haulmark or other individuals with hearing disabilities by failing to provide effective communication to ensure that no individual with a hearing disability is excluded, denied services, segregated or otherwise treated differently than other individuals without a hearing disability because of the absence of auxiliary aids and services;

iii.    to develop, implement, promulgate, and comply with a policy requiring that an in-person sign language interpreter is to be readily available and usable by individuals with hearing disabilities to provide effective communication on the grounds

of the Kansas State Capitol building. This policy is to require Defendants or their designated agency to maintain a list of sign language interpreters and ensure availability of such interpreters at any time when individuals without a hearing disability are able to participate in the Defendants' programs, services, or activities;

iv.     to develop, implement, promulgate, and comply with a policy requiring the existing facilities including the, but not limited to, broadcasting, streaming audio and video content, equipment to be readily accessible to and to be usable for Mr. Haulmark and other individuals with hearing disabilities;

v.     to develop, implement, promulgate, and comply with a policy requiring that prompt remedial measures are made to cure past violations of the Defendants' requirements to produce and publish the accurate transcripts to provide effective communication for all of the archived and future audio-only content published on the website administered by the Defendants;

vi.     to develop, implement, promulgate, and comply with a policy requiring that prompt remedial measures are made to cure past violations of the Defendants' requirements to produce and publish with the accurate captioning to provide effective communication to Mr. Haulmark and individuals with hearing disabilities for all of the archived and future videos on the Youtube channel or any other video hosting platforms administered by the Defendants;

vii.     to develop, implement, promulgate, and comply with a policy requiring all of the videos, being produced and published on social media platforms by the members of the Kansas Legislature, to provide effective communication to Mr. Haulmark and the individuals with hearing disabilities;

    viii. to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals with hearing disabilities of their right to effective communication. This notification will include posting explicit and clearly worded notices that the Defendants will provide sign language interpreters, transcripts, captioning services, and other services to ensure effective communication with individuals with hearing disabilities to participate in Defendants' services, programs, and activities; and

    ix. to develop, implement, promulgate, and comply with a policy to ensure that Defendants will provide training for all of their elected members, employees, staffs, and other agents on a regular basis about the rights of the individuals with hearing disabilities under the ADA and Section 504.

105. Retain jurisdiction over this action to ensure the Defendants' compliance with the mandates of the ADA and Section 504;

106. An award of Mr. Haulmark's compensatory damages in an amount to be determined at trial;

107. An award of reasonable expenses of court to Mr. Haulmark; and

108. Such other further relief as deemed just and proper.

## VII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury for all of the issues a jury properly may decide, and for all of the requested relief that a jury may award.

-----------------------------------------------------------------

DESIGNATION OF PLACE OF TRIAL

Mr. Haulmark designates Topeka, Kansas
as the location for the trial in this matter.

Respectfully submitted this 15th day of
June 2020

/s/ChrisHaulmark
PLAINTIFF, *pro se*
chris@sigd.net
600 S. Harrison St
Apt #11
Olathe, KS 66061
512-366-3981